IN THE UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF WISCONSIN

FRANK YOUNG AND MICHELLE HAZEN,
INDIVIDUALLY AND AS NEXT FRIENDS FOR
THEIR MINOR SON, D. Y.,

        PLAINTIFFS,

v

        File No:

INJURED PATIENTS AND FAMILIES
COMPENSATION FUND, MARSHFIELD
CLINIC HEALTH SYSTEM, INC., ASPIRUS
MEDICAL GROUP, INC., ASPIRUS, INC., JODY
GROSS, M.D., GEORGE HOEHN, M.D.,
BABATUNDE T. SOBOWALE, M.D., AND
CYNTHIA J. HENRY, D.O.,

        Hon.

        DEFENDANTS.

### Complaint and Jury Demand

Comes now the plaintiffs, Frank Young and Michelle Hazen, individually and as next friends for their minor son, D. Y., through their attorneys, Petrucelli & Waara, P.C., and for their complaint, state:

### Parties, Jurisdiction, and Venue

1.      The plaintiffs, Michelle Hazen, Frank Young, and their minor son, D. Y., are citizens of Michigan and live at N1495 Gallagher Street, Watersmeet, Michigan.

2.     D. Y. was born in March 2014.

3.     Michelle Hazen and Frank Young bring this case as the next friends for their minor son, D. Y.

4.     Michelle Hazen and Frank Young also bring this case for their losses arising from D. Y.'s injuries.

5.     The Injured Patients and Families Compensation Fund is a risk-sharing pool established under Wis. Stat 655.27(5). Its principal place of business is at 125 South Webster Street, Madison, Wisconsin.

6.     Defendant Marshfield Clinic Health System, Inc. ("Marshfield Clinic") is a Wisconsin corporation. Its registered agent is Jerard J. Jensen, and its principal office is at 1000 North Oak Avenue, Marshfield, Wisconsin.

7.     Marshfield Clinic operates a medical center in Marshfield, Wisconsin.

8.     Defendant Aspirus Medical Group, Inc. is a Wisconsin corporation. Its registered agent is J Michael Holzhueter and its principal office is at 425 Pine Ridge Blvd., Wausau, Wisconsin.

9.     Aspirus Medical Group, Inc. runs medical clinics throughout western Wisconsin.

10.     Defendant Aspirus Inc. is a Wisconsin corporation. Its registered agent is J Michael Holzhueter, and its principal office is at 2200 Westwood Drive, Wausau, Wisconsin.

11.     Aspirus, Inc. is a community-directed health system that provides a comprehensive range of health and medical services to western Wisconsin residents.

12.     Defendant Jody Gross, M.D., is a citizen of Wisconsin and lives at 114486 Quincy Lane, Marshfield, Wisconsin.

13.     Dr. Gross is a doctor licensed to practice in Wisconsin and practiced the specialties of pediatrics and neonatology.

14.     Dr. Gross provided pediatric and neonatology services for Marshfield Clinic.

15.     Defendant George Hoehn, M.D., is a citizen of Wisconsin and lives at 11521 Mill Creek Road, Marshfield, Wisconsin.

16.     Dr. Hoehn is a doctor who was licensed to practice in Wisconsin and practiced the specialties of pediatrics and neonatology.

17.     Dr. Hoehn provided pediatric and neonatology services for Marshfield Clinic.

18.     Defendant Babatunde T. Sobowale, M.D., is a citizen of Georgia and lives at 515 2nd Ave, Decatur, Georgia.

19.     Dr. Sobowale is a doctor licensed to practice in Wisconsin and practiced the specialties of pediatrics and neonatology.

20.     Dr. Sobowale provided pediatric and neonatology services for Marshfield Clinic.

21.     Defendant Cynthia J. Henry, D.O., is a citizen of Wisconsin and lives at 8002 County Road E, Woodruff, Wisconsin.

22.     Dr. Henry is a doctor licensed to practice in Wisconsin and practices pediatrics.

23.     Dr. Henry provided pediatric services for Aspirus Medical Group, Inc. and Aspirus, Inc.

24.     Drs. Gross, Hoehn, and Sobowale were employees of Marshfield Clinic, and their acts and omissions were performed within the scope and authority of their employment and agency.

25.     Dr. Henry was an employee of defendants Aspirus Medical Group, Inc. and Aspirus, Inc. Her acts and omissions were performed within the scope and authority of her employment and agency.

26.     The incidents giving rise to this action occurred between 28 March 2016 and 2 June 2014 in Wood and Oneida Counties, Wisconsin.

27.     The jurisdiction of this court is proper under 28 USC § 1332 because of the diversity of the parties' citizenship, and the amount in controversy exceeds seventy-five thousand dollars ($75,000).

28.     The acts causing D. Y.'s injuries occurred within the Western District of Wisconsin, and the venue is therefore proper in this District under 28 U.S.C § 1391(b).

### General Allegations

29.     Marshfield Clinic physician Maria Mascola, M.D., managed Michelle Young's pregnancy with D. Y.

30.     Throughout the pregnancy, obstetric ultrasounds revealed D. Y. evidenced "fetal hydronephrosis."

31.     Fetal hydronephrosis is swelling of the kidney caused by a backup of fetal urine. Hydronephrosis can occur in one kidney (unilateral) or both kidneys (bilateral). The swelling occurs in the area of the kidney known as the renal pelvis, where urine is stored.

32.     Dr. Muscola believed the fetal hydronephrosis was most likely explained by mild ureteropelvic junction obstruction and mild vesicoureteral reflux.

33.     In March 2014, Dr. Muscola delivered D. Y. via cesarean section at Ministry St. Joseph Hospital in Marshfield, Wisconsin.

34.     After his birth, D. Y.'s doctors hospitalized him at Ministry St. Joseph Hospital in Marshfield, Wisconsin.

35.     During his hospitalization, Drs. Gross, Hoehn, and Sobowale provided care for D. Y.

36.     Dr. Gross ordered D. Y. to undergo an ultrasound of his urinary tract.

37.     On 28 March 2014, Margo B. Cousins, M.D., a Marshfield radiologist, interpreted the urinary tract ultrasound.

38.     Dr. Cousins issued the following written report describing her interpretation of D. Y.'s urinary tract ultrasound:

> The right kidney measures 4.3x2.0x1.7 cm and the left kidney 4.2x2.0x1.3 cm. *There is mild pyelocaliectasis bilaterally.* Initially, the right kidney just showed a fluid distended renal pelvis with an extrarenal component and no fingering up in the calices but imaging later showed a very similar appearance to the left kidney with mild pyelocaliectasis. Neither ureter is enlarged proximally or distally although proximal visualization is somewhat limited by bowel gas on each side. (Emphasis added.)

39.     Pyelocaliectasis or hydronephrosis (also called urinary tract dilation) is when urine gathers in the center of the kidney, called the pelvis. This makes the kidney larger than normal. The condition can affect one or both kidneys.

40.     Urinary tract dilation in a newborn can result from a urinary tract blockage.

41.     Dr. Cousins' made her written interpretation of D. Y.'s urinary tract ultrasound available to Drs. Gross, Hoehn, and Sobowale.

42.     Drs. Gross, Hoehn, and Sobowale did no further diagnostic workups or referrals regarding D. Y.'s "bilateral pyelocaliectasis."

43.     Drs. Gross, Hoehn, and Sobowale never informed D. Y.'s family or his primary care providers of the urinary tract ultrasound that showed "bilateral pyelocaliectasis," its significance, and the need for follow-up care and treatment.

44.     Drs. Gross, Hoehn, and Sobowale never provided discharge instructions to D. Y.'s family that the abnormal urinary ultrasound showing "bilateral pyelocaliectasis" required him to undergo follow-up care and treatment, including urinary tract ultrasounds and care by qualified medical specialists.

45.     Dr. Sobowale discharged D. Y. from Ministry St. Joseph Hospital in Marshfield, Wisconsin, on 30 March 2014.

46.     After D. Y.'s release from the hospital, his parents relied on Dr. Henry to care for their son at the Aspirus Woodruff Clinic.

47.     Dr. Henry saw the baby for well-child checks beginning on 11 April 2014.

48.     During Dr. Henry's first check-up on 11 April 2014, she never mentioned the 28 March 2014 abnormal urinary tract ultrasound.

49.     On 2 May 2014, there was a one-month well-child check by Dr. Henry where she noted D. Y.'s problem list included "Hydronephrosis, bilateral – mild," which was "present on 3/28/2014."

50.     At the two-month well-child check by Dr. Henry on 2 June 2014, she again noted D. Y.'s problem list included "Hydronephrosis, bilateral – mild," which was "present on 28 March 2014."

51.     On 2 May 2014, Dr. Henry, without medical evidence, declared D. Y.'s bilateral hydronephrosis had "resolved."

52.     D. Y.'s bilateral hydronephrosis never resolved while under Dr. Henry's care.

53.     Dr. Henry never ordered that D. Y. undergo a urinary tract ultrasound.

54.     Dr. Henry undertook no diagnostic workups or made referrals regarding D. Y.'s urinary tract dilation.

55.     Dr. Henry never informed D. Y.'s family of his urinary tract dilation diagnosis, its significance, or the need for medical follow-up.

56.     In March 2018, D. Y. experienced urinary tract infection symptoms.

57.     Ultimately, doctors at the Marshfield Clinic provided care and treatment for D. Y.'s urinary tract symptoms.

58.     On 10 April 2018, D. Y. underwent a renal/bladder ultrasound at the Marshfield Clinic Minocqua Center.

59.     Matthew A. Thomas, M.D., a Marshfield Clinic urologist, reviewed the renal /bladder ultrasound results on 4 April 2018. He concluded:

> There is a significantly distended bladder with a diffusely thickened and trabeculated bladder wall. The patient has severe bilateral hydronephrosis with worse hydronephrosis on the right side than the left. There is significant cortical thinning associated with the significant hydronephrosis / pelvicaliectasis and ureterectasis.

60.     Dr. Thomas opined that D. Y. suffered from "significant urinary dilation with severe pelvicaliectasis and ureterectasis bilaterally, as

well as renal cortical thinning/atrophy, likely due to long-standing urinary dilation/incomplete bladder emptying."

61.     D. Y.'s lab results in April 2018 showed serum creatinine of 0.7 mg/dL, consistent with chronic kidney disease.

62.     Dr. Thomas referred D. Y. to Robert Haws, M.D., a pediatric nephrologist at the Marshfield Clinic Medical Center.

63.     On 17 April 2018, D. Y. underwent a voiding cystourethrogram, a minimally invasive test using a unique x-ray technology called fluoroscopy to visualize the urinary tract and bladder.

64.     Dr. Haws' assessment, based on the VCUG and his examination of D. Y., included these diagnoses:

1.  Obstructive uropathy with severe dilation of the upper urinary tract with cortical thinning.

2.  No evidence of primary lower tract obstruction other than the impaired emptying of the bladder consistent with what may be termed a non-neurogenic neurogenic bladder. I have discussed his neurologic examination with a member of the neurology department who does not feel the findings indicate the need for MRI of the spin.

3.  Chronic kidney disease, stage III, with an estimated GFR of 59.4 mL/minute/1.73 m2. This is concerning due to the cortical loss.

65.     Dr. Haws referred D. Y. to Charles Durkee, M.D., a pediatric urologist, for urodynamic testing and further evaluation.

66.     On 23 April 2018, Dr. Durkee examined D. Y. and assessed that D. Y. had an abnormal bladder with apparent outlet obstruction. He recommended a cystoscopy under anesthesia.

67.     On 7 April 2018, D. Y. underwent a cystoscopy by Dr. Durkee at the Marshfield Clinic Medical Center. After the procedure, Dr. Durkee reported:

> The anterior urethra was normal. There was clearly no evidence of posterior urethral valves. There was surprisingly a large polyp of the verumontanum which appeared like it could readily ball valve down into the external sphincter. The bladder neck was wide open. Uretreral orifices were orthotopic and normal in configuration. Grade 4 trabeculation was present in the bladder.

68.     Dr. Durkee removed the polyp during the cystoscopy.

69.     On 10 December 2018, Dr. Haws reevaluated D. Y. and found no improvement in the latest ultrasound. Significant hydronephrosis and cortical thinning remained in both the left and right kidneys. D. Y.'s renal functions remained stable, with a creatinine of 0.5, consistent with chronic kidney disease, stage 2.

70.     Dr. Durkee reevaluated D. Y. on 10 December 2018 and determined D. Y.'s bladder was likely permanently damaged and would never be fully functional.

71.     Given the damage to D. Y.'s bladder, Dr. Durkee recommended a vesicostomy.

72.     A vesicostomy is a surgery to make an opening through the skin on the belly to the bladder so that urine can drain out of the body. This surgery is done when urine fails to drain from the bladder.

73.     On 8 January 2019, D. Y. underwent a repeat cystoscopy and vesicostomy at the Marshfield Medical Center performed by Dr. Durkee.

74.     During the cystoscopy and vesicostomy, Dr. Durkee found a trabeculated bladder with partial urinary dilation and severe hydroureteronephrosis but without residual obstructing polyp at the verumontanum.

75.     A trabeculated bladder has a thickened wall, making it harder for the bladder to contract. This can make it difficult, if not impossible, to empty the bladder. The leading cause of bladder trabeculation is repeated or chronic urethral obstructions. This is when the urethra, which transports urine out of the body, becomes blocked numerous times.

76.     The polyp Dr. Durkee removed had been present since D. Y.'s birth and was responsible for his urinary tract dilation.

77.     Drs. Gross, Hoehn, Sobowale, and Henry's conduct delayed the diagnosis and treatment of D. Y.'s urinary tract dilation and the polyp, causing permanent and severe damage to his urinary tract, kidneys, and bladder.

78.     Because of the delayed diagnosis and treatment of his urinary tract dilation and the polyp, D. Y. suffered:

> a.     Progression of his urinary tract dilation and the polyp, causing a permanent injury to his kidneys, urinary tract, and bladder;
>
> b.     Past and future renal and urinary care and treatment;

c. Past and future physical pain and mental anguish, physical impairment, disability, humiliation, and embarrassment;

d. Past and future medical, surgical, pharmaceutical, nursing, attendant care, therapy, and hospital expenses.

**Count I**
**(Dr. Gross's Negligence)**

79.   Michelle Hazen and Frank Young, as next friends for their minor son, D. Y., repeat paragraphs 1 through 78 as if set forth herein.

80.   Under Wisconsin's common law and statutes, Dr. Gross owed D. Y. a duty to skillfully and prudently care, treat, advise, and observe him in such a way as would a reasonably prudent pediatrician-neonatologist confronted with the same or similar conditions and circumstances.

81.   Dr. Gross breached the duty owed to D. Y. in one or more of these ways:

a. She did not obtain a complete medical history regarding D. Y.;

b. She did not undertake a complete and thorough physical examination of D. Y.;

c. She did not appreciate D. Y.'s history of urinary tract dilation required follow-up care and treatment;

d. She did not appreciate, recognize and act on the significance of the findings of the 28 March 2014 urinary tract ultrasound, which showed urinary tract dilation;

e.   She did not communicate D. Y.'s pertinent history, including his abnormal urinary tract dilation and the need for specific follow-up care, including repeat urinary tract ultrasounds, to his primary care providers;

f.   She did not diagnose D. Y.'s urinary tract dilation;

g.   She did not recognize and act on the knowledge that urinary tract dilation, if left unattended, could cause permanent urinary tract, bladder, and renal damage;

h.   She did not consult with and refer D. Y. to the care of qualified specialists for further evaluation and treatment to manage his urinary tract dilation;

i.   She did not inform D. Y.'s parents that their son suffered from urinary tract dilation;

j.   She did not inform D. Y.'s parents that he required follow-up evaluations, including urinary tract ultrasounds and potential treatment of his urinary tract dilation, by a qualified specialist;

k.   She did not inform D. Y.'s parents of the possible consequences of failing to timely medically attend to his urinary tract dilation, including but not limited

> to permanent renal, bladder, and urinary
> tract damage.

82.    Dr. Gross' conduct was a proximate cause of D. Y.'s injuries and damages.

WHEREFORE, Michelle Hazen and Frank Young, as next friends for their minor son, D. Y., seek a judgment against the defendants Jody Gross, M.D., and the Injured Patients and Families Compensation Fund in whatever amount they are found to be entitled in excess of $75,000, plus interest, costs, and attorney fees.

**Count II**
**(Dr. Hoehn's Negligence)**

83.    Michelle Hazen and Frank Young, as next friends for their minor son, D. Y., repeat paragraphs 1 through 82 as if set forth herein.

84.    Under Wisconsin's common law and statutes, Dr. Hoehn owed D. Y. a duty to skillfully and prudently care, treat, advise, and observe him in such a way as would a reasonably prudent pediatrician-neonatologist confronted with the same or similar conditions and circumstances.

85.    Dr. Hoehn breached the duty owed to D. Y. in one or more of these ways:

    a.    He did not obtain a complete medical history regarding D. Y.;

    b.    He did not undertake a complete and thorough physical examination of D. Y.;

    c.    He did not appreciate D. Y.'s history of urinary tract dilation required follow-up care and treatment;

d.  He did not appreciate, recognize and act on the significance of the findings of the 28 March 2014 the urinary tract ultrasound, which showed urinary tract dilation;

e.  He did not communicate D. Y.'s pertinent history, including his abnormal urinary tract dilation and the need for specific follow-up care, including repeat urinary tract ultrasounds, to his primary care providers;

f.  He did not diagnose D. Y.'s urinary tract dilation;

g.  He did not recognize and act on the knowledge that urinary tract dilation, if left unattended, could cause permanent urinary tract, bladder, and renal damage;

h.  He did not consult with and refer D. Y. to the care of qualified specialists for further evaluation and treatment to manage his urinary tract dilation;

i.  He did not inform D. Y.'s parents that their son suffered from urinary tract dilation;

j.  He did not inform D. Y.'s parents that he required follow-up evaluations, including urinary tract ultrasounds and

potential treatment of his urinary tract dilation by a qualified specialist;

k.  He did not inform D. Y.'s parents of the possible consequences of failing to timely attend to his urinary tract dilation, including, but not limited to, permanent renal, bladder, and urinary tract damage.

86.  Dr. Hoehn's conduct was a proximate cause of D. Y.'s injuries and damages.

WHEREFORE, Michelle Hazen and Frank Young, as next friends for their minor son, D. Y., seek a judgment against the defendants George Hoehn, M.D., and the Injured Patients and Families Compensation Fund in whatever amount they are found to be entitled in excess of $75,000, plus interest, costs, and attorney fees.

## Count III
## (Dr. Sobowale's Negligence)

87.  Michelle Hazen and Frank Young, as next friends for their minor son, D. Y., repeat paragraphs 1 through 86 as if set forth herein.

88.  Under Wisconsin's common law and statutes, Dr. Sobowale owed D. Y. a duty to skillfully and prudently care, treat, advise, and observe him in such a way as would a reasonably prudent pediatrician-neonatologist confronted with the same or similar conditions and circumstances.

89.  Dr. Sobowale breached the duty owed to D. Y. in one or more of these ways:

a.  He did not obtain a complete medical history regarding D. Y.;

b.  He did not undertake a complete and thorough physical examination of D. Y.;

c.  He did not appreciate D. Y.'s history of urinary tract dilation required follow-up care and treatment;

d.  He did not appreciate, recognize and act on the significance of the findings of the 28 March 2014 urinary tract ultrasound, which showed urinary tract dilation;

e.  He did not communicate D. Y.'s pertinent history, including his abnormal urinary tract dilation and the need for specific follow-up care, including repeat urinary tract ultrasounds, to his primary care providers;

f.  He did not diagnose D. Y.'s urinary tract dilation;

g.  He did not recognize and act on the knowledge that urinary tract dilation, if left unattended, could cause permanent urinary tract, bladder, and renal damage;

h.  He did not consult with and refer D. Y. to the care of qualified specialists for further evaluation and treatment to manage his urinary tract dilation;

i. He did not inform D. Y.'s parents that their son suffered from urinary tract dilation;

j. He did not inform D. Y.'s parents that he required follow-up evaluations, including urinary tract ultrasounds and potential treatment of his urinary tract dilation by a qualified specialist;

k. He did not inform D. Y.'s parents of the possible consequences of failing to timely medically attend to his urinary tract dilation, including, but not limited to, permanent renal, bladder, and urinary tract damage.

90.     Dr. Sobowale's conduct was a proximate cause of D. Y.'s injuries and damages.

WHEREFORE, Michelle Hazen and Frank Young, as next friends for their minor son, D. Y., seek a judgment against the defendants Babatunde T. Sobowale, M.D., and the Injured Patients and Families Compensation Fund in whatever amount they are found to be entitled in excess of $75,000, plus interest, costs, and attorney fees.

## Count IV
### (Dr. Henry's Negligence)

91.     Michelle Hazen and Frank Young, as next friends for their minor son, D. Y., repeat paragraphs 1 through 90 as if set forth herein.

92.     Under Wisconsin's common law and statutes, Dr. Henry owed D. Y. a duty to skillfully and prudently care, treat, advise, and observe him in such a way as would a reasonably prudent pediatrician confronted with the same or similar conditions and circumstances.

93.    Dr. Henry breached the duty owed to D. Y. in one or more of these ways:

    a.    She did not obtain a complete medical history regarding D. Y.;

    b.    She did not undertake a complete and thorough physical examination of D. Y.;

    c.    She did not appreciate D. Y.'s history of urinary tract dilation required follow-up care and treatment;

    d.    She did not appreciate, recognize and act on the significance of the findings of the 28 March 2014 urinary tract ultrasound, which showed urinary tract dilation;

    e.    She failed to order diagnostic tests, including urinary tract ultrasounds, to help in determining the status of D. Y.'s urinary tract dilation;

    f.    She did not diagnose D. Y.'s urinary tract dilation;

    g.    She declared his urinary tract dilation "resolved" when it was not;

    h.    She declared his urinary tract dilation "resolved" without medical evidence to substantiate such a conclusion;

    i.    She did not recognize and act on the knowledge that urinary tract dilation, if left unattended, could cause permanent

urinary tract, bladder, and renal damage;

j. She did not consult with and refer D. Y. to the care of qualified specialists for further evaluation and treatment to manage his urinary tract dilation;

k. She did not inform D. Y.'s parents that their son suffered from urinary tract dilation;

l. She did not inform D. Y.'s parents that he required follow-up evaluations, including urinary tract ultrasounds and potential treatment of his urinary tract dilation by a qualified specialist;

m. She did not inform D. Y.'s parents of the possible consequences of failing to timely medically attend to his urinary tract dilation, including, but not limited to, permanent renal, bladder, and urinary tract damage.

94. Dr. Henry's conduct was a proximate cause of D. Y.'s injuries and damages.

WHEREFORE, Michelle Hazen and Frank Young, as next friends for their minor son, D. Y., seek a judgment against the defendants Cynthia J. Henry, D.O., and the Injured Patients and Families Compensation Fund in whatever amount they are found to be entitled in excess of $75,000, plus interest, costs, and attorney fees.

**Count V**
**(Marshfield Clinic's Negligence)**

95.     Michelle Hazen and Frank Young, as next friends for their minor son, D. Y., repeat paragraphs 1 through 94.

96.     Through its duly authorized employees and agents, Marshfield Clinic undertook to examine, diagnose, treat, attend, and care for D. Y.

97.     Marshfield Clinic, through its employees and agents, owed D. Y. a duty, under Wisconsin's common law and statutes, to skillfully, prudently, and care, treat, advise, and observe him in such a way as would reasonably prudent doctors confronted with the same or similar conditions and circumstances.

98.     Under the doctrine of respondeat superior, Marshfield Clinic is responsible for the negligent conduct of its agents and employees.

99.     Marshfield Clinic's conduct was a proximate cause of D. Y.'s injuries and damages.

WHEREFORE, Michelle Hazen and Frank Young, as next friends for their minor son, D. Y., seek a judgment against the defendants Marshfield Clinic Health System, Inc., and the Injured Patients and Families Compensation Fund, in whatever amount they are found to be entitled in excess of $75,000, plus interest, costs, and attorney fees.

**Count VI**
**(Aspirus Medical Group, Inc.'s Negligence)**

100.     Michelle Hazen and Frank Young, as next friends for their minor son, D. Y., repeat paragraphs 1 through 99.

101.     Aspirus Medical Group, Inc., through its duly authorized employees and agents, undertook to examine, diagnose, treat, attend, and care for D. Y.

102.    Aspirus Medical Group, Inc., through its employees and agents, owed D. Y. a duty, under Wisconsin's common law and statutes, to skillfully, prudently, and care, treat, advise and observe him in such a way as would  reasonably prudent doctors confronted with the same or similar conditions and circumstances.

103.    Under the doctrine of respondeat superior, Aspirus Medical Group, Inc., is responsible for the negligent conduct of its agents and employees.

104.    Aspirus Medical Group, Inc.'s conduct was a proximate cause of D. Y.'s injuries and damages.

WHEREFORE, Michelle Hazen and Frank Young, as next friends for their minor son, D. Y., seek a judgment against the defendants Aspirus Medical Group, Inc., and Injured Patients and Families Compensation in whatever amount they are found to be entitled in excess of $75,000, plus interest, costs, and attorney fees.

## Count VII
## (Aspirus, Inc.'s Negligence)

105.    Michelle Hazen and Frank Young, as next friends for their minor son, D. Y., repeat paragraphs 1 through 104.

106.    Through its duly authorized employees and agents, Aspirus, Inc. undertook to examine, diagnose, treat, attend, and care for D. Y..

107.    Aspirus, Inc., through its employees and agents, owed D. Y. a duty, under Michigan's common law and statutes, to skillfully, prudently, and care, treat, advise and observe him in such a way as would reasonably prudent doctors confronted with the same or similar conditions and circumstances.

108.    Under the doctrine of respondeat superior, Aspirus, Inc. is responsible for the negligent conduct of its agents and employees.

109.    Aspirus, Inc.'s conduct was a proximate cause of D. Y.'s injuries and damages.

WHEREFORE, Michelle Hazen and Frank Young, as next friends for their minor son, D. Y., seek a judgment against the defendants Aspirus, Inc., and Injured Patients and Families Compensation in whatever amount they are entitled in excess of $75,000, plus interest, costs, and attorney fees.

### Count VIII
### (Michelle Hazen and Frank Young's Individual
### Claims Against all Defendants)

110.    Michelle Hazen and Frank Young repeat paragraphs 1 through 108 as if set forth herein.

111.    Michelle Hazen and Frank Young, due to the injuries sustained by their son, D. Y., have incurred and will incur out-of-pocket expenses to care for the well-being of their child, including transportation expenses and medical reimbursement expenses.

112.    All of the defendants' combined negligent conduct was a proximate cause of the damages Michelle Hazen and Frank Young sustained.

WHEREFORE, Michelle Hazen and Frank Young, as next friends for their minor son, D. Y., seek a judgment against the defendants Injured Patients and Families Compensation Fund, Marshfield Clinic, Inc., Aspirus Medical Group, Inc., Aspirus, Inc., Judy Gross, M.D., George Hoehn, M.D., Babatunde T. Sobowale, M.D., and Cynthia J. Henry, D.O., in whatever amount they are found to be entitled in excess of $75,000, plus interest, costs, and attorney fees.

Dated:  April 17, 2023               **Petrucelli & Waara, P.C.**
                                     Attorneys for Plaintiffs


                                     By:/s/ Vincent R. Petrucelli
                                        Vincent R. Petrucelli (P30055)
                                        328 W. Genesee St., PO Box AA
                                        Iron River, Michigan 49935
                                        Telephone: (906) 265-6173
                                        Email: vincent@truthfinders.com


## Jury Demand

The plaintiffs demand trial by jury.


Dated:  April 17, 2023               **Petrucelli & Waara, P.C.**
                                     Attorneys for Plaintiffs


                                     By:/s/ Vincent R. Petrucelli
                                        Vincent R. Petrucelli (P30055)
                                        328 W. Genesee St., PO Box AA
                                        Iron River, Michigan 49935
                                        Telephone: (906) 265-6173
                                        Email: vincent@truthfinders.com