IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

FRANK YOUNG and MICHELLE HAZEN,
individually and as next friends for
their minor son, D.Y.,

                Plaintiffs,

v.                                                       OPINION and ORDER

INJURED PATIENTS AND FAMILIES                     23-cv-235-jdp
COMPENSATION FUND, MARSHFIELD CLINIC
HEALTH SYSTEM, INC., HOLLY M. FROST, and
CYNTHIA J. HENRY,

                Defendants.

---

This medical malpractice case arises from problems with plaintiffs' son's bladder and kidneys. D.Y. was born with swollen kidneys, a fairly common condition that often resolves without treatment. But in the first years of his life, D.Y.'s doctors did not confirm that the swelling resolved. When D.Y. was four years old he had acute urinary problems. Doctors determined that a polyp on his urethra had been blocking his bladder outlet and that pressure from urine buildup had caused lasting damage to his bladder and kidneys. Plaintiffs contend that D.Y. would not have suffered this injury if his doctors had treated D.Y.'s kidney swelling when it was first discovered.

Plaintiffs have sued several of D.Y.'s health care providers, but the motions now before the court concern only one defendant: Dr. Cynthia Henry, D.Y.'s pediatrician for the first 15 months of his life. The parties dispute whether there is reliable evidence that Henry's treatment decisions caused damage to D.Y.'s bladder and kidneys. Henry moves to exclude testimony about causation from plaintiffs' two experts and, based on this motion, she moves for summary

judgment. Dkt. 80. Plaintiffs counter with a motion to exclude the causation testimony from Henry's two experts. Dkt. 86.

All four experts acknowledge that urinary tract polyps are so rare that no one can say precisely when D.Y.'s polyp began growing or obstructing D.Y.'s bladder. But each of the experts offers opinions about whether the polyp could have been detected in the 15 months during which Henry treated D.Y. Each side has an expert on the standard of care applicable to pediatricians, but those experts fail to explain the basis of their opinions on causation. The court will exclude the causation testimony from those two experts. The parties also have experts in pediatric nephrology, Dr. Andrew Stec and Dr. Carl Gruskin. Stec and Gruskin draw reasonable but opposing inferences based on their expertise to make their conclusions about causation. Neither expert's conclusions are unimpeachable, but they are both admissible. The court will deny the parties motions to exclude the causation opinions Stec and Gruskin and deny Henry's motion for summary judgment.

## UNDISPUTED FACTS

The following facts are not genuinely disputed, except where noted.

Plaintiff Michelle Hazan became pregnant with D.Y. in 2013. Hazan lived in the Upper Peninsula of Michigan and she received prenatal care at the Marshfield Clinic in Marshfield, Wisconsin. Ultrasounds during pregnancy showed that D.Y. had hydronephrosis, a swelling in his kidneys from a buildup of urine. D.Y. was born on March 27, 2013, and has Down syndrome. An ultrasound of D.Y.'s kidneys and bladder the next day showed continued mild hydronephrosis. D.Y.'s doctors did not determine the cause of the hydronephrosis at that time.

Hydronephrosis at birth is not uncommon, and in mild cases it often resolves without intervention within six months. If an ultrasound at four to six months of age shows continued swelling, the standard of care is to perform additional testing to diagnose the cause and treat the condition.

On April 3, 2014, D.Y. had his first regular checkup with his pediatrician, defendant Cynthia Henry at a clinic in Rhinelander, Wisconsin. D.Y.'s medical records from that visit list bilateral hydronephrosis as one of D.Y.'s health problems. Henry saw D.Y. for regular checkups until she left the clinic where plaintiffs had been taking him. She did not order any additional testing of D.Y.'s kidneys. Henry's last visit with D.Y. was July 14, 2014. The parties dispute whether Henry explained to plaintiffs what types of follow up D.Y. should receive for the condition and whether she referred them to a pediatric nephrologist.

In February 2018, D.Y. had urinary problems; initially he received treatment for a urinary tract infection. In April 2018, an ultrasound of D.Y.'s urinary system showed that he had a trabeculated bladder, which means that its walls had thickened, making it more difficult for it to expand and contract to fully empty. The ultrasound also showed hydronephrosis in both kidneys, impairing his kidney function. Further tests and imaging in April and May revealed that D.Y. had a benign urethral polyp. The polyp had been intermittently blocking D.Y.'s urine flow, causing the backup of urine that in turn caused the thickening of the walls of his bladder and hydronephrosis. The pediatric urologist removed the polyp when it was discovered.

D.Y.'s hydronephrosis did not resolve following removal of the polyp. In January 2019, he had a procedure called a vesicostomy to have a tube inserted into his bladder through his abdomen to provide a path for D.Y.'s urine to drain. D.Y.'s vesicostomy remained in place until

3

it was removed in January 2024, when he began the transition back to urinating through his urethra. As of March of 2024, D.Y. could urinate through his urethra and had improved kidney function, but he continued to take daily medication to help with his urination and needed to be instructed to urinate every three to four hours.

The court has apparent jurisdiction based on diversity of citizenship under 28 U.S.C. § 1332. Plaintiffs are citizens of Michigan; Henry and the two corporate defendants are citizens of Wisconsin. The amount in controversy exceeds $75,000. But the only information in the record about the citizenship of the other individual defendant, Dr. Holly Frost, is plaintiffs' allegation that she is a citizen of Colorado. Dkt. 40, ¶ 26. The court will decide the pending motions on the presumption that Frost is not a citizen of Michigan, but the parties must provide actual evidence of Frost's citizenship before this case can proceed to trial.

ANALYSIS

Plaintiffs bring a state-law claim for medical malpractice against Henry. The parties agree that Wisconsin law governs plaintiffs' claim. Under Wisconsin law, "[a] claim for medical malpractice, as all claims for negligence, requires the following four elements: (1) a breach of (2) a duty owed (3) that results in (4) an injury or injuries, or damages." *Paul v. Skemp*, 2001 WI 42, ¶ 17, 242 Wis. 2d 507, 625 N.W.2d 860. The only disputed element in the pending motions is causation. "To establish causation in Wisconsin, the plaintiff bears the burden of proving that the defendant's negligence was a substantial factor in causing the plaintiff's harm." *Ehlinger by Ehlinger v. Sipes*, 155 Wis. 2d 1, 12, 454 N.W.2d 754, 758 (1990).

The parties agree that D.Y.'s urethral polyp damaged his bladder and kidneys by obstructing the outflow of urine through his urethra. But they dispute whether there is any

reliable evidence that Henry's treatment of D.Y. in the first 15 months of his life caused that damage because there is no direct evidence of when the polyp first began growing. This issue "involves technical, scientific or medical matters which are beyond the common knowledge or experience of jurors," so plaintiffs must provide expert testimony to establish this element of their claim. *Ollman v. Wisconsin Health Care Liab. Ins. Plan*, 178 Wis. 2d 648, 667, 505 N.W.2d 399, 405 (Ct. App. 1993) (citation omitted). The parties' experts agree that no one can determine precisely when the polyp began growing, but they offer opposing opinions about whether it is reasonable to infer from the medical evidence that additional testing in the first 15 months of D.Y.'s life would have detected progressive changes in his bladder and kidneys that would have triggered earlier intervention to prevent D.Y.'s injuries.

Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592–93 (1993) and *Kumho Tire Company, Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999), the court must ensure that proffered expert testimony meets the requirements of Rule 702. For testimony to be admissible under Rule 702, the expert must be qualified, his opinions must be based on reliable methods, and those methods must be reliably applied to the facts of the case. *Myers v. Ill. Cent. R. R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010). When assessing an expert's qualifications and methodology, the court must look at each of the conclusions he draws individually to see if he has the adequate education, skill, and training to reach them. *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010).

Henry and plaintiffs both move to exclude the opinions of the opposing party's medical experts concerning the cause of D.Y.'s injuries on the grounds that the experts did not apply a reliable methodology. Henry also moves for summary judgment; that motion rises or falls with Henry's motion to exclude plaintiffs' experts' testimony.

**A. Plaintiffs' experts**

Plaintiffs rely on the opinions of two physicians, Dr. Stephen Harris and Dr. Andrew Stec, to support their contention that Henry's failure to order a follow-up ultrasound or otherwise take steps to address D.Y.'s hydronephrosis in the first 15 months of his life caused his kidney and bladder damage later in life. Both experts opine that D.Y.'s hydronephrosis would have worsened over the four years before he started having symptoms. They opine that if D.Y. had been given an ultrasound when Henry was his pediatrician, then the test would have shown that his hydronephrosis had not resolved on its own and prompted additional testing to discover the cause before the obstruction in his urethra caused lasting damage to his bladder and kidneys.

**1. Dr. Stephen Harris**

Harris is a practicing pediatrician and clinical professor in the department of pediatrics at Stanford Medical School.[1] He routinely encounters infants with hydronephrosis in his clinical practice, Dkt. 84 (Harris Dep. 43:21–44:18), but he has no special expertise in nephrology. Henry does not challenge Harris's qualifications to offer opinions on the standard of care for urinary tract conditions in infants. But Henry contends that Harris provides nothing more than speculation to support his conclusion that "it is nearly certain that persistent or worsening hydronephrosis would have been present" if Henry had ordered a follow-up ultrasound of D.Y.'s kidneys or referred him to a specialist. Dkt. 52-5, at 7.

---

[1] The only copy of Harris's report on the docket has blank spaces in place of certain letters that make it extremely difficult to read. Plaintiffs are directed to file an updated copy of Harris's report that corrects this problem by the deadline for Rule 26(a) disclosures and motions in limine.

"[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). *See also Zamecnik v. Indian Prairie School Dist. No. 204*, 636 F.3d 874, 881 (7th Cir. 2011) ("Mere conclusions, without a hint of an inferential process, are useless to the court." (internal quotation marks and citation omitted)). Harris has experience treating infants and children with hydronephrosis, but his report does not provide any explanation or analysis to connect that experience with his conclusion that Henry's failure to follow the standard of care caused D.Y.'s lasting urinary system damage. Harris asserts that "it is inconceivable that the fetal hydronephrosis, confirmed still present at birth, would have somehow disappeared and then reappeared later." Dkt. 52-5, at 7. This assertion is a mere conclusion without any explanation of what information in the medical record or Harris's training led to it.

The court will exclude testimony from Harris concerning causation. Harris may testify about whether Henry's treatment of D.Y. met the standard of care, but he may not opine that the damage to D.Y.'s bladder and kidneys would have been prevented if Henry had provided treatment consistent with the standard of care.

2. **Dr. Andrew Stec**

Stec is a pediatric urologist whose routine practice includes evaluating and treating infants and children with hydronephrosis and bladder outlet obstruction. Dkt. 82-8, at 1. Henry does not challenge Stec qualifications to offer opinions on the standard of care for urinary tract conditions.

But Henry contends that Stec's opinions about causation should be excluded as "purely speculative" because Stec has no basis to conclude that the polyp that obstructed D.Y.'s urethra

7

could have been detected and removed in the 15 months in which Henry was treating D.Y. Dkt. 83, at 1. Henry argues that Stec did not apply a reliable methodology to reach his conclusions that D.Y. had a progressively worsening congenital condition because he did not cite any medical literature or studies concerning the growth rate of urethral polyps and has no experience treating such polyps.

Because pediatric urethral polyps are so rare, neither side's experts can say precisely how quickly the polyp grew or when it began obstructing D.Y.'s urine outflow. But, according to Stec, the type of damage that D.Y. experienced results only from a prolonged period of pressure on the bladder. Dkt. 82-8. So, based on his analysis of the medical record and his knowledge of other bladder diseases, Stec infers that the cause of D.Y.'s hydronephrosis at four years old was likely the same thing that caused his hydronephrosis at birth. Stec thus concludes that it is more likely than not that D.Y.'s condition would have been detected if Henry had ordered testing to discover the cause of his hydronephrosis during the first 15 months of his life.

Stec explains the reasoning behind his conclusion that D.Y.'s hydronephrosis at four years old likely had the same cause as his hydronephrosis at birth. "[A]n expert need not testify with complete certainty about the cause of an injury" for his testimony to be admissible. *Gayton*, 593 F.3d at 619; *see also Lapsley v. Xtek, Inc.*, 689 F.3d 802, 806 (7th Cir. 2012) (expert testimony about an expert's hypothesis of how an accident occurred was admissible even though "[n]o one was able to recreate [the accident] or to determine to an absolute certainty what was the precise cause"). Stec's opinion doesn't have to be unimpeachable to be admissible. He drew reasonable inferences from the evidence based on his experience and expertise. That is all that matters here; whether his opinion is ultimately persuasive is for the jury.

8

Because Stec applied a reliable methodology to reach his conclusions, the court will deny Henry's motion to exclude Stec's testimony concerning causation. That means the court will also deny Henry's motion for summary judgment, which is based on the lack of expert support on the causation element.

## B. Henry's experts

Henry's experts, Dr. Paul Veldhouse and Dr. Carl Gruskin, opine that the mild hydronephrosis seen on D.Y.'s first post-natal ultrasound likely resolved on its own in the first year of his life, and that the polyp that obstructed D.Y.'s bladder outflow was a new condition that developed after D.Y. left Henry's care. Plaintiffs ask the court to exclude these causation opinions as inadmissible ipse dixit untethered to any reliable method. Plaintiffs make different arguments for the two experts, so the court will address each in turn.

### 1. Dr. Paul Veldhouse

Veldhouse is a practicing pediatrician who has treated patients with hydronephrosis following their birth. But, like Harris, Veldhouse has no special expertise in nephrology.

Veldhouse explains that mild hydronephrosis like D.Y.'s usually resolves in the first few months of a child's life. He says that "it is not definitive or even probable that with appropriate ultrasound followup that [D.Y.'s] condition would have been diagnosed in the first year of life" because there is no evidence that the polyp "was large enough to finally become obstructive" until D.Y. had urinary dysfunction symptoms. Dkt. 87-10, at 7. Plaintiffs contend that this opinion is based on an "erroneous leap of faith" that ignores the medical evidence and that Veldhouse cannot provide a reliable opinion about D.Y.'s polyp because he did not review the surgical reports from its removal. Dkt. 87, at 17.

9

Veldhouse's failure to review the surgical reports is not the primary problem. Veldhouse does not provide any analysis or explanation for his conclusion that an ultrasound of D.Y.'s kidneys when he was six months old "would not have been helpful at all." Dkt. 87-10, at 6. Veldhouse acknowledges that urethral polyps in children are rare and that the literature does not explain how quickly they grow. Just like Harris, Veldhouse offers a conclusion about causation without any connection to his experience or an articulated chain of reasoning. The court will exclude any testimony from Veldhouse concerning whether problems with D.Y.'s urinary tract were undetectable while Henry was treating him. Veldhouse may testify about whether Henry's treatment of D.Y. met the standard of care.

### 2. Dr. Carl Gruskin

Gruskin is a practicing pediatric urologist and professor of pediatrics at the medical school at the University of Southern California who routinely sees patients with hydronephrosis. Gruskin explains that hydronephrosis at birth usually resolves on its own and that urethral polyps in infants are very rare. Dkt. 87-14, at 3–4. According to Guskin, the fact that D.Y. did not experience symptoms until he was four years old suggests that D.Y.'s later hydronephrosis and polyp was an entirely separate problem from his earlier post-natal hydronephrosis.

Gruskin supports his analysis with consideration of posterior urethral valves (PUV), a more common condition that obstructs urine flow from the bladder. According to Gruskin, an infant with PUV would develop bladder thickening and hydronephrosis within a period of months. So, based on that time frame, Gruskin concludes that D.Y.'s later urinary problems also developed relatively rapidly, making it unlikely that D.Y.'s polyp could have been diagnosed in the first 15 months of his life, when D.Y. was in Henry's care.

10

Plaintiffs contend that this is not a reliable method for assessing how long D.Y.'s polyp was obstructing his urine flow because PUV is a different condition, and Gruskin does not explain why damage from PUV would progress at the same rate as from D.Y.'s urethral polyp.

Like Stec, Gruskin drew inferences about the progress of D.Y.'s condition based on his knowledge and experience with childhood urinary tract disease. Gruskin draws the opposite conclusion, but he explained his inferential process, which is no less reasonable the Stec's. Again, whether Gruskin's opinions are persuasive will be up to the jury. But they are admissible under Rule 702. The court will deny plaintiffs' motion to exclude Gruskin's testimony.

ORDER

IT IS ORDERED that:

1. Defendant Cynthia Henry's combined motion to strike plaintiffs' expert witnesses on causation and motion for summary judgment, Dkt. 80, is GRANTED IN PART as follows:

    a. Henry's motion to exclude testimony from Dr. Stephen Harris about the cause of D.Y.'s injuries is GRANTED;

    b. Henry's motion to exclude testimony from Dr. Andrew Stec about the cause of D.Y.'s injuries is DENIED; and

    c. Plaintiffs' motion for summary judgment is DENIED.

2. Plaintiffs' motion to strike the causation opinion testimony of Henry's expert witnesses, Dkt. 86, is GRANTED IN PART as follows:

    a. Henry's motion to exclude testimony from Dr. Paul Veldhouse about the cause of D.Y.'s injuries is GRANTED;

    b. Henry's motion to exclude testimony from Dr. Carl Gruskin about the cause of D.Y.'s injuries is DENIED.

3. Plaintiffs are directed to file a corrected copy of Dr. Stephen Harris's expert report and provide evidence that the court has jurisdiction based on diversity of citizenship under 28 U.S.C. § 1332 by February 28, 2025.

Entered February 11, 2025.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge